DEBORAH M. SMITH
Acting United States Attorney

LARRY D. CARD
Assistant U.S. Attorney
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
E-mail: larry.card@usdoj.gov
AK Bar No. 8011068

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:05-cr-0115-JWS |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S** |
| vs. | ) | **OPPOSITION TO DEFENSE** |
| | ) | **MOTIONS TO SUPPRESS** |
| SANDRA ELAINE MITCHELL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW the United States Attorney's Office, by and through

Larry D. Card,  Assistant U.S. Attorney, and hereby responds to defendant Sandra

Mitchell's various Motions to Suppress Evidence.  Defendant has filed four

separate motions to suppress, based upon alleged violations of her Fourth, Fifth,

and Sixth Amendment rights under the United States Constitution. For the reasons stated below, each motion should be denied, and the court find that each of the procedures employed by the government investigators were proper, and none of the defendant's constitutional rights violated.

## FACTUAL AND PROCEDURAL HISTORY

On December 10, 2005, at approximately 10:40 p.m., a private citizen who resided at 520 Carin Place in Anchorage, Alaska, called the police department to complain about a female unknown to him doing what he described as "hiding" in his back yard. When Anchorage police officers Witte and Smith arrived, the still unidentified defendant Mitchell told the officers to stay away from her. The officers reported that "her hair was very messy and she had a crazy look about her." At that time, the officers reported that their first thought was that she was having mental health problems or medical issues that were causing her to act so bizarrely. The officers also reported that she was talking about things that made no sense, and she continued to tell Officer Witte to not touch her. At the time the officers saw the defendant, she was holding two blue bags in her hands along with a blue document folder. Officer Witte reported that the defendant was approximately ten feet from him, and she continued to tell him to not touch her.

Officers Smith and Witte then reported that they decided to take her into

protective custody for both her and their safety since she continued to act irrationally, and still remained unidentified.  The officer reported that the defendant resisted their efforts to cuff , and was fighting with them while continuing to tightly hold on to the two blue bags.  One of the officers made attempts to grab the bags out of her hands, while both of them continued in their struggle to handcuff her.  The officers reported that they eventually had to pry the bags out of her hands in order to handcuff her.

Once the officers had subdued Ms. Mitchell, they still had no indication of what her name may be, or what her mental or medical condition was,  so the officers checked the blue bags and blue folder that were now scattered across the ground for any identification or any medication to help explain who the defendant was, and possibly give a clue as to why she may be acting so strangely.  The officers also reported that they thought that they might  get a clue to her medical or mental status if they found  some  medication.  The officers then reported that they wanted to make sure that there were no weapons or firearms in the bags since Providence Hospital, where they were taking her, does not allow firearms in the hospital.  The officers then reported opening one of the bags described as a "duffle" bag, and after making a quick look inside for any identification, weapons or medication with a name, then they picked up the scattered papers, and placed

them in the bag for safekeeping.  The officers then reported that they looked in a bag described as a "small black Arctic Cat bag."  The officers reported that as soon as they opened the bag, they noticed a coffee cup with what was described as "a large amount of crystal methamphetamine," which was estimated as approximately 12 ounces.

Officer Carson reported that his first thought was that the white substance may have been snow, since he was still thinking that he most likely had a mental health case rather than an illegal controlled substance case.  Officer Carson also reported that once he realized that he was most likely looking at illegal substances, he immediately stopped looking for identification, and proceeded to apply for a search warrant for the bags and the defendant's person.  Once the warrant was received, the subsequent search  resulted in finding an additional several ounces of crystal methamphetamine and two additional bindles containing what the officers described as "diamonds."

The officers then successfully obtained a warrant to search the defendant's home at 5908 Craig, after an unsuccessful attempt had been made , and proceeded to execute that warrant.  The officers found some items of evidential value, and also searched through two garbage bags on the front porch of the home.  Upon dumping the bags, the officers found three empty tennis ball containers, and

decided that they may be of evidential value, even though they had been found in the trash. The officers then reported that they contacted the neighbor at 5900 Craig, and received her permission to search several large trash cans in front of her home. In one of the trash cans, the officers found a plastic trash bag similar in appearance to the bag seen on the defendant's porch that contained a box with several "almost empty" clear plastic tennis ball containers. In the bottom of some of the containers, the officers observed more of what appeared to the officers to be crystal methamphetamine.

The defendant was indicted by the federal grand jury, and arraigned on a charge of Possession with intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B). The defendant is pending an evidentiary hearing on February 3, 2006 at 9:30 a.m. before the honorable John Roberts, Magistrate Judge.

## DISCUSSION

### 1. THE OFFICERS PROPERLY TOOK THE DEFENDANT INTO PROTECTIVE CUSTODY AND PROPERLY ARRESTED HER UPON FINDING CONTROLLED SUBSTANCES

The defendant argues that the officers violated her constitutional rights when they took her into protective custody. She also argues that even if there is a state

law allowing the police to take people into protective custody, there has to be 'probable cause to believe that [the person] posed an immediate threat to cause serious harm to herself or [to] others," citing Alaska Statute § 47.30.705.

The defendant would have a good argument, except for the fact that she was brought to the attention of the Anchorage Police by her bizarre behavior, which logically led the police top assume that she was having either medical or mental health issues.  It was not as if the defendant were in her own yard, or her own home acting as she was acting.

A citizen unrelated to the defendant called the police because of his concern that he had an unknown female acting very strangely in his fenced backyard.  The police proceeded as if she were a medical or mental health case until they found the crystal methamphetamine, then properly proceeded to consider her case a criminal case.

The defendant has cited the case of *Maag v. Wessler, 960 F.2d 773 (9th Cir. 1992)* in support of her argument that the police violated her constitutional rights when they initially detained her for her safety since they had no probable cause to detain her.  In *Maag v. Wessler,* the plaintiff Maag had been taken into custody for a medical evaluation by police, so he filed a civil rights action against the city and the police officers.  The court noted in its discussion that mentally ill people have a

right to be free of unreasonable governmental seizure, most often analyzed under the due process clause of the Fourteenth Amendment. The court cited *O'Connor v. Donaldson, 433 U.S. 563, 573-76, 95 S.Ct. 2486,2492-94 (1975).* The court also indicated that since "seizure is analogous to a criminal arrest...[it] must therefore be supported by probable cause." *Maag, at 773.*

Applying the foregoing to the defendant's case, the officers were called out on a dark winter night on a citizen's complaint about a strange woman in his backyard who appeared to him to be acting in a bizarre way. The officers approached Ms. Mitchell, and acted reasonably in detaining her for her safety, thinking that she was a mental health case or suffering from a serious medical condition. The officers had probable cause to detain her from judging from what they had observed about her and the surrounding circumstances. The officers clearly also had not only reasonable suspicion to detain her after finding the methamphetamine, but also probable cause to arrest her, based on how she appeared and acted toward them, and her voluntary spontaneous statement that she had "used  too much meth tonight and needed to go to the hospital." The motion should be denied.

## 2.  THE POLICE  DID NOT VIOLATE THE DEFENDANT'S CONSTITUTIONAL RIGHTS  BY LOOKING THROUGH HER  BAGS SEARCHING FOR AN I.D. OR MEDICATION OR ANY CLUE AS TO WHY SHE WAS ACTING  STRANGELY

The defendant contends that the police had no right to "search" through her bags as they were taking her into protective custody.  It also seems that the defendant then moves on to say that once she had been arrested for possession of the controlled substances, the police still had no right to search the bags that she was trying to hold onto during her detention, then subsequent arrest. Defendant concedes the law of "search incident to arrest," citing  *United States v. Nohara, 3 F.3d 1239 (9th Cir. 1993);  and United States v. Turner, 926 F.2d 883, 887-88 (9th Cir. 1991).*   *Nohara* discusses the issue of property in the public domain, and how a person has no reasonable expectation of privacy "in the hallway of a high security, high-rise apartment building."  *Nohara, at 1241.  Turner* discusses the issue of search incident to arrest, citing  *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034 (1969).  When making a lawful arrest, police may conduct a warrantless search of the area within the arrestee's immediate control, that is, "the area from within which he might gain possession of a weapon or

destructible evidence." *Turner, at 887,* citing, *Chimel v. California, 395 U.S. at 763.*

Defendant does not specifically cite the relevance of the two cases, other than a prelude for her argument that the facts do not support a search incident to her arrest. Quite the contrary, the facts do support the search of the defendant's bags incident to her arrest. First of all, it was reasonable for the officers to look through her bags for any type of identification or medication, and once she was arrested for the controlled substance possession, it was lawful for the officers to do what amounted to a cursory search of her bags for controlled substances (the subject of the arrest or any type of weapon that she may have been concealing in the bags. The defendant's motion should therefore be denied.


### 3.   THE DEFENDANT INTELLIGENTLY,  KNOWINGLY,  AND VOLUNTARILY AGREED TO WAIVE COUNSEL AND TALK TO THE LAW ENFORCEMENT OFFICERS

The defendant correctly cites the rules  regarding  *Miranda* on page 5 of her brief, citing *Edwards v. Arizona,* and *United States v. Younger.*  Pursuit  to *Miranda v, Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966),* a person has a right to the assistance of counsel during custodial interrogations.  In *Edwards v. Arizona, 451*

*U.S. 477, 101 S. Ct. 1880 (1981),* the Supreme Court held that *Miranda* established that "when an accused has invoked his right to have counsel present," [she]he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85; *see also* discussion in *United States v. Foster, 227 F.3d 1096, 1102 (9th Cir. 2000 ),* and *United States v. Younger, 398 F.3d, 1179,1185-86 (2005).*

Applying the foregoing discussion to the defendant's case, the defendant did make an unambiguous request for the assistance of counsel, and the officers honored that request and went off of record.  The government intends to elicit testimony from the investigating officers at the hearing so that the government can meet its burden of proof  to show that the defendant knowingly, intelligently,  and voluntarily agreed to talk to the officers after initially indicating that she wanted an attorney.

There is no record of any deprivation, threats, or promises made to the defendant, but the evidence which the government intends to offer during the evidentiary hearing will clarify the issue  for the court, and the court will have sufficient  facts available to determine whether the statements made by the defendant were of her own free will, and with the requisite knowledge of what she

was giving up when she decided to talk to the officers.  The test that the court

must employ is the "totality of circumstances" test, as discussed in the previously

cited cases.

### CONCLUSION

The only real issues for the court's consideration revolve around the questin

of whether the defendant knowingly, intelligently, and voluntarily waived her

*Miranda* rights after invoking them.    Therefore, in all  respects, the defendant's

motions should be denied.

RESPECTFULLY SUBMITTED on this <u>1st</u> day of February, 2006, in

Anchorage, Alaska.

DEBORAH M. SMITH
Acting United States Attorney

<u>s/ Larry D. Card         </u>
Assistant U.S. Attorney
Alaska Bar No. 8011068
222 West 7th Ave., #9, Rm. 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-1500
E-mail: larry.card@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1,2006
a copy of the foregoing Opposition to Motions
was served via electronic service:


Michael Dieni, Asst. Federal Public Defender


s/ Larry D. Card _____