DEBORAH M. SMITH
Acting United States Attorney

LAWRENCE D. CARD
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, Room 253, #9
Anchorage, Alaska  99513-7567
(907) 271-5071
larry.card@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. 3:05-cr -00115-RRB |
| ) | |
| Plaintiff, ) | |
| ) | **GOVERNMENT'S** |
| vs. ) | **SENTENCING** |
| ) | **MEMORANDUM** |
| SANDRA ELAINE MITCHELL, ) | |
| ) | |
| ) | |
| Defendant. ) | |

COMES NOW the United States of America, by and through counsel, and submits its memorandum for the Imposition of Sentence Hearing scheduled for June 28, 2006.

## I.   INTRODUCTION

The United States had no objections to the Pre-sentence Investigation Report (PSR).

The United States agrees with the factual statements and the conclusions set forth in the PSR. From the government's perspective, the defendant was guided by her addiction and in addition, emotionally tied to Ronald Sorenson, who was her "common-law" stepson. It appears that her addiction led her to help Sorenson obtain more methamphetamine, and in fact when she was found by the Anchorage Police wandering around in front of a citizen's house at approximately 10:40 p.m., she appeared to be a mental health case. The officers approached the defendant like a mental health case, and not until they found the substantial amount of methamphetamine in her possession did they suspect that she was "strung out" on some substance.

From statements given by Ms. Mitchell and the fact gathering performed by the investigating officers, it is clear that Mr. Sorenson was the leader of their drug conspiracy. He arranged for the purchase of the methamphetamine, set up the purchase of the Money Grams, and was the direct contact with the California drug connection. While Mr. Sorenson was in jail on unrelated State of Alaska charges and Ms. Mitchell was still uncharged, he called her from the Anchorage Jail, and asked her to get rid of the methamphetamine. He was talking in "code", but clearly he wanted her to dump the drugs before they were found. Rather than dump the drugs, she gathered them up, and was found to be in possession of in

excess of approximately 12 ounces of methamphetamine, 300 grams mixed. When the drugs were analyzed, the mixture contained over 119 grams of actual methamphetamine. The methamphetamine had been shipped to Alaska in tubes of tennis balls from California, and such tubes were found in the garbage at Ms. Mitchell's home, and at her the neighbor's home. The call from Sorenson to Ms. Mitchell while he was incarcerated on a State of Alaska warrant was recorded, and discovered to both Mitchell's and Sorenson's counsel. Clearly, Sorenson was in charge, and directed Mitchell to get rid of the drugs not the other way around. Also, since the defendant was heavily addicted to methamphetamine, she did exactly what an addicted person would do under the circumstances as they developed. The defendant used all of the methamphetamine that her body could stand, and in fact told the officers that she needed to go to a hospital to receive medical treatment.

     The government thus believes that the defendant was a "minor participant" as it is defined in the sentencing guidelines, and therefore will join the defendant in asking that the court so find, and reduce the defendant's guideline calculation by 2 points to a 27. Otherwise, the government will not offer any recommendation to the court, but ask that the defendant's sentence reflect her level of involvement, and properly consider the guidelines as one of the factors the court considers in

determining the defendant's sentence. A sentence after a reduction for being a minor participant will properly address the sentencing factors as well as the other considerations such as community condemnation and rehabilitation. The defendant will also have an opportunity to go through drug treatment and aftercare, and upon her release during her supervised release period, she will return to society a healthier person ready to take on the normal responsibilities of being an adult such as being a parent, working, and remaining drug and alcohol free.

## II.   SENTENCING ISSUES

### A.   The Agreed Estimated Sentencing Range Should be Utilized

The government urges that the Court impose a sentence within the non-binding agreed to sentencing range, taking the guidelines as a factor to be considered by the court as a factor in the sentencing. In *United States v. Booker*, 2005 WL 50108 (U.S. Jan. 12, 2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004).

The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines

"effectively advisory." *Booker*, 2005 WL 50108, at 16. This ruling results in a system in which the sentencing court, while informed by the Guidelines, may impose any sentence within the statutory maximum penalty for the offense of conviction. The sentence would be subject to review by the Court of Appeals for "reasonableness," except in the instant case, the defendant has agreed to waive her right to appeal his sentence for reasonableness. See *Booker*, Id. at 24.

In the wake of *Booker*, this Court must make a correct calculation under the existing Sentencing Guidelines, and then consider the final guideline calculation when determining the sentence to be imposed. Justice Breyer's majority opinion directed that "[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 27.

As the justices in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. See, e.g., id. at 21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies

the crime of conviction."); id. at 42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of

similar conduct . . . ."

## II. SENTENCING RECOMMENDATION

The government has calculated a guideline sentenced as follows in accordance to the agreement of the parties:

(1)  **A sentence within the 78-97 months in custody guideline**;

(2)  **No fine is requested** due to the defendant's inability to pay;

(3)  **Restitution is not an issue**;

(4)  **A four (4) year period of supervised release with,** and;

(5)  **A special assessment in the amount of $100.00** is, of course, required.

RESPECTFULLY SUBMITTED this 21st day of June, 2006, at Anchorage, Alaska.

        DEBORAH M. SMITH
        Acting United States Attorney

        s/ Lawrence D. Card
        Assistant U.S. Attorney
        222 West 7th Ave., #9, Rm. 253
        Anchorage, AK 99513-7567
        Phone: (907) 271-5071
        Fax: (907) 271-1500
        E-mail: larry.card@usdoj.gov
        Alaska Bar No. 8011068

<u>CERTIFICATE OF SERVICE</u>
I declare under penalty of perjury that a true and correct copy of the foregoing was sent to the following counsel of record on June 21, 2006, via electronic notice to:

Michael Dieni, Asst. Federal Public Defender

<u>S/ Lawrence D. Card</u>